**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SHARON GILMORE, on behalf of herself and others similarly situated, )<br><br>Plaintiff, )<br><br>v. )<br><br>INTERNATIONAL BUSINESS MACHINES CORP. )<br><br>Defendant. ) | Civil Action No. 1:21-cv-9574-JF<br><br>JURY DEMANDED ON COUNT I |

**AMENDED COMPLAINT**

## I.   INTRODUCTION

1.      Plaintiff worked for Defendant International Business Machines Corporation (hereinafter "IBM") until her termination.  Plaintiff has alleged that she was discriminated against on the basis of age (both in being terminated by IBM and not being hired into other open positions at IBM) in violation of the Age Discrimination in Employment Act ("ADEA"), as amended, 29 U.S.C. § 621 *et seq.*

2.      Plaintiff alleges that, upon her termination, she was fraudulently induced by IBM to enter into an agreement that provided a modest severance payment in exchange for a release of most legal claims (but not a federal ADEA claim) and which required her to pursue any federal ADEA claim in individual confidential arbitration.

3.      Plaintiff brings this claim of fraudulent inducement on behalf of herself and a class of similarly situated former IBM employees over the age of 40 who were terminated, or otherwise separated, from IBM (including constructively discharged), who

1

were fraudulently induced to enter IBM's agreement which required them to pursue ADEA claims against IBM in individual confidential arbitration.

4.      On behalf of a class, Plaintiff thus challenges the enforceability of IBM's arbitration agreement because IBM fraudulently induced Plaintiff and other similarly situated employees to sign the agreement under false pretenses.

5.      In particular, IBM communicated to Plaintiff and other similarly situated employees that the reason for their terminations (or events that led to their constructive discharge) were based upon legitimate, non-discriminatory reasons, rather than based on their age.  However, as set forth below, in fact, IBM has been engaging in a years-long effort to oust older employees from the workplace in order to make room for younger employees and thereby build a younger workforce.  Had Plaintiff and other similarly situated employees known that the true reason for their discharge (or the events that led to their constructive discharge) was actually based upon age discrimination (in particular, the desire of IBM's CEO and other top executives to shift the demographics of the company toward younger employees), they would not have signed the agreement that would have relegated their pursuit of ADEA claims to individual confidential arbitration, where IBM has impeded their ability to pursue their claims as fully as they would have been able to in court.

6.      In addition, IBM fraudulently induced Plaintiff and other similarly situated employees to sign the arbitration agreement based upon misstatements that the employees would only receive COBRA benefits, upon their separation from IBM, if they signed the agreement.  Receipt of COBRA benefits (which allow employees to maintain health insurance after they leave a job) is a right that employees have that is not and

cannot be contingent on signing a severance agreement.  However, IBM knowingly misled employees into believing they could only maintain their health care coverage, through COBRA, by signing the agreement (which contained the arbitration clause). Had Plaintiff and other similarly situated employees understood that they could maintain their health insurance through COBRA without signing the agreement, they would not have signed the agreement and thereby relegated their pursuit of ADEA claims to individual confidential arbitration, where IBM has impeded their ability to pursue their claims as fully as they would have been able to in court.

7.      Following her termination, Plaintiff did bring an ADEA claim against IBM in arbitration.  In arbitration, for Plaintiff as well as other similarly situated employees who have likewise pursued or attempted to pursue ADEA claims against IBM, IBM has sought to strictly enforce the confidentiality clause in its arbitration agreement, which impedes the ability of employees, such as Plaintiff, from enforcing their rights under the ADEA.

8.      Plaintiff seeks a declaration in this action that the confidentiality provision in IBM's arbitration agreement is unenforceable.  This claim is brought pursuant to the federal Declaratory Judgment Act, 28 U.S.C. §§ 2201-02.[1]

---

[1]      As set forth above, Plaintiff brings her claim of fraudulent inducement on behalf of a class of similarly situated employees.  Plaintiff brings the Declaratory Judgment Act claim on behalf of herself.  This matter has been administratively related to approximately 50 other actions that have been collectively designated In Re: Second Wave IBM Arbitration Litigation, C.A. No. 21-cv-9574-JF.  The Court administratively closed all but this lead case in that coordinated set of actions.  Both the fraudulent inducement claim and the Declaratory Judgment Act claim brought here are intended to be brought by all plaintiffs in those related actions.  The fraudulent inducement claim is brought as a class action, or alternatively, as individual actions by these plaintiffs.  The Declaratory Judgment action is brought as individual actions by all these plaintiffs.

## II.    <u>PARTIES</u>

9.    Plaintiff resides in Hobe Sound, Florida.  Plaintiff was formerly employed by IBM and has brought a claim of age discrimination against IBM under the ADEA.

10.    Plaintiff brings her fraudulent inducement claim as an individual, or alternatively class claim under Rule 23 of the Federal Rules of Civil Procedure, on behalf of a class of similarly situated former IBM employees over the age of 40 who were terminated, or otherwise separated, from IBM (including constructively discharged) and were fraudulently induced to enter IBM's agreement which required them to pursue ADEA claims against IBM in individual confidential arbitration.

11.    Defendant International Business Machines Corp. is a New York corporation with its principal place of business in Armonk, New York.  IBM is a multinational technology company that offers services and goods ranging from computing, cloud platforms, advanced analytics tools, and others.

## III.    <u>JURISDICTION AND VENUE</u>

12.    This Court has general federal question jurisdiction over this matter pursuant to 28 U.S.C. § 1331, because Plaintiff has brought a claim pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201-02.  An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2202 that is of sufficient immediacy and reality to warrant declaratory relief.  This claim concerns whether a provision of IBM's arbitration provision is enforceable.  Moreover, the underlying relief that Plaintiff seeks against IBM in arbitration falls under federal law, namely the Age Discrimination in Employment Act ("ADEA"), as amended, 29 U.S.C. § 621 *et seq.* Jurisdiction is therefore proper under 28 U.S.C. § 1331.

13.     The Court also has diversity jurisdiction and supplemental jurisdiction over the state law fraudulent inducement claim asserted in this action.  See 28 U.S.C. §§ 1332, 1367. With respect to the class fraudulent inducement claim, the Court also has jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2).

14.     The Southern District of New York is the proper venue for this action pursuant to 28 U.S.C. § 1391(b)(1) because IBM's principal place of business is in Armonk, New York.

## IV.     **STATEMENT OF FACTS**

15.     Plaintiff has brought a claim in arbitration under the ADEA, contending that IBM engaged in age discrimination, which involved a years-long companywide scheme implemented by IBM's top management to build a younger workforce, by reducing its population of older workers in order to make room for more younger workers.

16.     This discriminatory scheme is detailed in the Second Amended Complaint in the matter of Rusis et al. v. International Business Machines Corp., C.A. No. 18-cv-08434 (S.D.N.Y.) (Dkt. 179), a class and collective action pending in this district, brought under the ADEA.  Briefly stated, in Rusis, the plaintiffs allege that IBM has pushed out thousands of older workers over a period of years, while hiring younger workers (which the company often refers to as "Early Professional Hires" or "New Collar" workers), in order to better compete with newer technology companies, such as Google, Facebook, Amazon, and others.

17.     Indeed, IBM has been investigated for age discrimination by the Equal Employment Opportunity Commission ("EEOC").  Following a multi-year investigation, on August 31, 2020, the EEOC issued a classwide determination in which it found

reasonable cause to believe that IBM discriminated against older employees during the period 2013 to 2018.  In its determination letter, the EEOC noted that it had uncovered "top-down messaging from IBM's highest ranks directing managers to engage in an aggressive approach to significantly reduce the headcount of older workers to make room for Early Professional Hires." The EEOC revealed that it had analyzed data from across the company and that it was primarily older workers (more than 85%) who were in the total potential pool of those employees considered for layoff. The EEOC stated in its determination letter that its conclusion was supported by dozens of interviews it had conducted across the company, as well as analysis of data, and it rejected IBM's attempt to justify and defend the layoffs of the 58 charging parties, whose claims had been consolidated for investigation, through individualized explanations.

18.     When it laid off employees, IBM avoided providing disclosures of the ages of employees who had been laid off and those not laid off (and other related information), as required by the Older Workers' Benefits Protections Act ("OWBPA"), 29 U.S.C. § 626(f)(1)(H), by not including a waiver of ADEA claims in the release that it asked the employees to sign.  Instead, it offered the employees subject to layoff a very modest severance payment in exchange for a waiver of almost all legal claims, other than a claim under the ADEA.  The agreement provided, however, that if the employee chose to pursue a claim under the ADEA, it would need to be in individual arbitration.

19.     Plaintiff signed this arbitration agreement and later brought a claim of discrimination under the ADEA in arbitration.

20.     The arbitration agreement includes a provision that states: "Any issue concerning the validity or enforceability of this Agreement . . . shall be decided only by a court of competent jurisdiction."

21.     IBM's arbitration agreement includes a confidentiality provision.  IBM has aggressively used this confidentiality provision in order to attempt to block employees, including the Plaintiff, who are pursuing their claims in arbitration, from using and sharing information and rulings obtained in their cases with other employees pursuing similar claims, which also challenge the same general practice IBM has engaged in to build a younger workforce by forcing out many older employees. IBM's use of this confidentiality provision runs counter to an objective of the ADEA which is "furthered when even a single employee establishes that an employer has discriminated against him or her. **The disclosure through litigation of incidents or practices that violate national policies respecting nondiscrimination in the work force is itself important.**" McKennon v. Nashville Banner Pub. Co., 513 U.S. 352, 358-59 (1995) (emphasis added) (citing Alexander v. Gardner–Denver Co., 415 U.S. 36, 45 (1974) ("[T]he private litigant [in Title VII] not only redresses his own injury but also vindicates the important congressional policy against discriminatory employment practices")).

22.     Indeed, former IBM employees have brought ADEA claims against IBM and uncovered documents that fall into three categories: "(i) age bias was rampant at the executive level, (ii) executives created and implemented the fire-and-hire scheme, and (iii) executives used and encouraged coded language to conceal IBM's illegal actions." Townsley, et. al. v. International Business Machines Corporation, C.A. No.: 1:20-cv-00969, Dkt. 64 at 3 (W.D. Tex. September 8, 2021). These documents "include,

but are not limited to, documents reflecting IBM's CEO having applauded the mocking of older IBM employees as a whole, and other CEO communications expressing dissatisfaction with the percentage of millennials hired by IBM being too low for her tastes." Id. at 13.

23.    Although Plaintiff's counsel represent employees who have obtained a number of these incriminating documents in their arbitrations, IBM has resisted producing them (and other relevant documents) in other arbitrations, despite their obvious importance to all claims of discrimination by older workers challenging their layoffs or separations from the company, by invoking the confidentiality provision in its arbitration agreement.

24.    This confidentiality provision – and IBM's overbroad use of it - is unconscionable and unenforceable because it unduly hinders employees, such as Plaintiff, from advancing their claims under the ADEA, particularly in such a case that relies heavily on pattern and practice evidence.  Numerous courts have limited the operation of confidentiality provisions in arbitration as "secrecy provisions of the arbitration agreements [that] both affect the outcomes of individual arbitrations and clearly favor Defendants." Schnuerle v. Insights Communications Co., 376 S.W.3d 561, 579 (Ky. 2012) (quoting Acorn v. Household Intern., Inc., 211 F. Supp. 2d 1160, 1173 (N.D. Cal. 2002)).  Courts have stricken confidentiality provisions in arbitration agreements since they give the defendant an "obvious informational advantage." Larsen v. Citibank FSB, 871 F.3d 1295, 1319 (11th Cir. 2017).[2]

---

[2]    See also McKee v. AT&T Corp., 164 Wash.2d 372, 398 (2008) (striking a confidentiality provision where the arbitration claimants "are prevented from sharing discovery, fact patterns, or even work product, such as briefing, forcing them to reinvent

25.     In arbitration, Plaintiff is likewise prevented by IBM's confidentiality provision from benefiting from decisions obtained in other similar arbitrations and sharing discovery with other arbitration claimants who are pursuing this same claim against IBM.  Courts have recognized that such of information can be critical to employees building a case of discrimination, particularly in pattern or practices cases of discrimination.[3]  Because of this one-sidedness, Plaintiff is severely hampered, if not fully prevented, from obtaining relief under the ADEA in arbitration.

---

the wheel in each and every claim, no matter how similar."); <u>Kinkel v. Cingular Wireless LLC</u>, 223 Ill. 2d 1, 42 (Ill. 2006) (finding that confidentiality provisions may be unconscionable when coupled with class action waivers, because such provisions prevent "the claimant [and] her attorney [from] shar[ing] [] information with other potential claimants."); <u>Zuver v. Airtouch Communications, Inc</u>., 153 Wn.2d 293, 299 (Wash. 2004) (finding an arbitration confidentiality provision unconscionable and unenforceable, concluding that "[a]s written, the provision hampers an employee's ability to prove a pattern of discrimination or to take advantage of findings in past arbitrations"; "keeping past findings secret undermines an employee's confidence in the fairness and honesty of the arbitration process, and thus potentially discourages that employee from pursuing a valid discrimination claim."); <u>Ting v. AT&T</u>, 319 F.3d 1126, 1152 (9th Cir. 2003) (recognizing that confidentiality provisions in arbitration agreements hamper ability of claimants to "obtain[] the information needed to build a case"; <u>DeGraff v. Perkins Coie</u>, 2012 WL 3074982, at *4 (N.D. Cal. July 30 2012) (severing confidentiality provision);  <u>Bragg v. Linden Research, Inc</u>., 487 F. Supp. 2d 59 (E.D. Pa. 2007) (finding a confidentiality clause within an arbitration agreement to be unconscionable because it allows a company to "place[] itself in a far superior legal posture by ensuring that none of its potential opponents have access to precedent" and "[t]he unavailability of arbitral decisions could also prevent potential plaintiffs from obtaining the information needed to build a case of intentional misconduct against a company.").

[3]     As noted above (paragraph 10), Plaintiff cannot be deemed to have waived her right to build her case under the ADEA because IBM did not provide the disclosures regarding the ages of employees who were laid off and were not laid off, as required by the OWBPA.  <u>See</u> <u>Oubre v. Entergy Operations, Inc</u>., 522 U.S. 422, 426-27 (1998).

26.     In 2012, Virginia ("Ginni") Rometty became the President and CEO of IBM.

27.     In approximately June 2013, Ms. Rometty promoted a senior human resources executive, Diane Gherson, to the position of Senior Vice President and Chief Human Resources Officer ("CHRO").  Ms. Gherson communicated directly and frequently with Ms. Rometty and was responsible for implementing and executing Ms. Rometty's policies and agenda concerning the structuring of IBM's workforce.

28.     Ms. Rometty desired to aggressively alter the age demographics of IBM's workforce by targeting older workers for adverse employment actions, such as layoff programs (referred to as "Resource Actions" at IBM), as well as other actions that were intended to lead to their termination or constructive discharge (such as giving employees the "option" of continuing their employment by relocating across the country, when IBM knew that very few employees would accept this "option").

29.     Ms. Rometty, unbeknownst to the rank-and-file workforce she led (as well as many of its managerial employees), harbored deep animus toward IBM's older workers.  Ms. Rometty hid her discriminatory animus from much of IBM's rank-and-file workforce.  However, she directly communicated "behind closed doors" with executives such as Ms. Gherson regarding her discriminatory plans to exit older workers from the company because of their age, and Ms. Gherson helped implement the scheme to shift the company's demographics towards younger employees.

30.     IBM is a highly sophisticated and well-resourced company.  Over a period of years, extending back at least to 2013, IBM devised and implemented this scheme to

conceal its discriminatory programs to oust older workers from the company and shift its age demographics to younger workers.

31.     Around approximately 2014, IBM decided that it would no longer provide its laid off workers information required by the Older Workers' Benefits Protections Act ("OWBPA"), 29 U.S.C. § 626(f)(1)(H) because such information could enable IBM's laid off workers to discover IBM's discriminatory scheme and expose the true purpose behind the structuring of IBM's programs, including Resource Actions, to target and exit older workers so as to make room for a younger workforce as desired by IBM's CEO.

32.     In 2014, when IBM announced its unorthodox refusal to provide OWBPA information with its separation agreements, IBM had its spokesperson provide pretextual and untruthful rationales in order to mislead IBM's workforce into believing that the change in policy was being done to protect their privacy interests.[4]  For example, IBM spokesperson Doug Shelton assisted IBM in misleading its workforce by claiming that the change was made to address "concerns raised by employees that the age/title information the company previously provided infringed on employee privacy." See https://www.insurancejournal.com/news/national/2014/05/13/328904.htm.  IBM executives instructed Mr. Shelton to provide information that was misleading to IBM employees.  In reality, this decision was made to conceal the aggressive discriminatory layoff scheme IBM had been and would continue engaging in for a period of years.

---

[4]     Indeed, IBM had never disclosed the names of laid off employees prior to this change - merely their ages and position titles.

33.     IBM also made changes to its separation agreements in approximately 2014 or 2015 that would require employees to bring their claims under the ADEA in individual arbitration, while releasing nearly all other claims.

34.     IBM's decision to require individual arbitration was also made with the known purpose to conceal IBM's discriminatory scheme and make it more burdensome (if not all but impossible) for individuals to prove IBM's plainly discriminatory layoff scheme and high-level policies and practices.  IBM's executives understood that the decision to require individual confidential arbitration would assist them in their efforts to conceal IBM's discriminatory patterns and practices and mislead laid off workers because it would make it difficult for employees to amass pattern and practice evidence of the broad-based discriminatory scheme in which IBM engaged and would hinder their ability to prevail on claims under the ADEA.

35.     In order to convince the victims of its discriminatory scheme to sign a separation agreement in which they would waive their rights to pursue any claims in court (and could instead only pursue claims of age discrimination in individual arbitration, where IBM would aggressively block their sharing of evidence with other employees pursuing similar claims), IBM fraudulently and in bad faith represented to its employees that they were being laid off for legitimate business reasons (or that the circumstances leading to their constructive discharges – for example, being offered a "choice" to remain with the company but relocate to another part of the country — were the result of legitimate business reasons).

36.     For example, IBM provided employees with template letters indicating that the company was required to lay them off due to their allegedly unneeded skills and/or

the company's decision to move in a different business direction.  IBM provided these

pretextual explanations to conceal the fact that the Resource Actions were knowingly

structured in a discriminatory manner to further the CEO's discriminatory goals to shift

the age demographics of the company toward a younger workforce.[5]

     37.    Indeed, although IBM claimed that these Resource Actions were so-called

"reductions in force", IBM was simultaneously hiring and recruiting younger workers to

replace employees in the targeted protected age group who were being purged through

the layoffs.

     38.    IBM executives knowingly planned hiring and recruitment programs

targeted at younger workers, right around the time of IBM's simultaneous termination

programs, while informing the terminated employees within the protected age group

(over age 40) that their layoffs were necessary as part of a large corporate downsizing.

     39.    IBM executives, such as Ginni Rometty, Diane Gherson, and other senior

human resources executives reporting directly to Ms. Gherson knowingly and carefully

guarded demographic data and information that might lead others within IBM's

organization to discover their discriminatory policies and practices.  IBM executives

knowingly concealed details of their discriminatory scheme from lower-level managers

---

[5]    See Zampierollo-Rheinfeldt v. Ingersoll-Rand de Puerto Rico., Inc., 999 F.3d 37,
58 (1st Cir. 2021) (even an employer who has a "compelling reason wholly unrelated to
the [age] of any of its employees to reduce the size of its work force may still be liable
under the ADEA if it use[s] the occasion as a convenient opportunity to get rid of its
[older] workers.") (citations and internal quotation marks omitted); Matthews v.
Commonwealth Edison Co., 128 F.3d 1194, 1195 (7th Cir. 1997) (accord); see also
Rowell v. BellSouth Corp., 433 F.3d 794, 798 (11th Cir. 2005) (an age discrimination
plaintiff can "present circumstantial statistical evidence regarding age; or evidence that
the employer's plan was subterfuge for discrimination, such as evidence that an
employee-rotation plan existed which shifted protected workers into jobs most likely to
be cut in the reduction in force.").

and representatives so that its lower-level managers and representatives could carry out IBM's targeted Resource Actions without even knowing that they were being forced to terminate targeted workers from a proverbial "stacked deck" of individuals within the protected age group.

40.     IBM further coached low-level managers to parrot pretextual, pre-determined rationales for the need for the Resource Actions resulting in the employees' termination.  However, IBM did not provide these low-level managers with information regarding the true purpose of their discriminatory layoff scheme, and thus IBM relied on low-level managers to fraudulently convey misleading information in order to induce Plaintiff and other similarly situated employees to sign IBM's standard separation agreement.

41.     IBM's carefully crafted scheme was designed to fraudulently mislead its workforce, with the exception of the relatively small number of senior executives who were privy to the decisions made to target older workers (and privy to the hard statistical data that executives monitored to ensure their policies and practices were achieving their discriminatory ends).

42.     Plaintiff and other similarly situated employees would never have signed IBM's separation agreement had they known that IBM terminated them in a Resource Action that was part of a larger scheme of blatant and systematic age discrimination and that, by signing such agreement, they would be giving up their ability to effectively pursue claims that they were victims of systemic age discrimination.

43.     Moreover, IBM's managers and human resource professionals presented employees with inaccurate and/or misleading information regarding their legal rights in connection with their separation from IBM.

44.     For example, IBM also fraudulently induced Plaintiff and other similarly situated employees to sign IBM's separation agreement (containing the arbitration clause and class action waiver) by misrepresenting to them that they could only maintain their health benefits through COBRA by signing the agreement.

45.     In approximately October 2018, Plaintiff Gilmore was informed that if she did not sign her separation agreement, she would not be eligible to receive COBRA health insurance coverage.  On information and belief, managers and human resource professionals at IBM conveyed incomplete and/or inaccurate information that would reasonably lead numerous employees such as Plaintiff into believing they had to sign the separation agreement or risk losing their ability to maintain health insurance coverage.

**CLASS ALLEGATIONS**

46.     Plaintiff brings Count I on behalf of herself and other individuals over age 40 who were terminated at IBM via a so-called "Resource Action" program (or constructively discharged or otherwise terminated) at any point between 2013 to the present and who signed an IBM separation agreement that purported to waive their rights to pursue any claims against IBM except federal age discrimination claims which could only be pursued in individual confidential arbitration.

47.     Class action treatment of this action is appropriate because all of Federal Rule of Civil Procedure 23's class action requisites are satisfied.  In particular:

(a)     The class includes more than 40 individuals, all of whom are readily ascertainable based on IBM's records and are so numerous that joinder of all class members is impracticable.

(b)     Plaintiff is a class member, her claims are typical of the claims of other class members, and she has no interests that are antagonistic to or in conflict with the interests of other class members.

(c)     Plaintiff and her lawyers will fairly and adequately represent the class members and their interests.

(d)     Questions of law and fact are common to all class members because, *inter alia,* this action concerns IBM's fraudulent scheme to mislead its workers into requiring that they pursue any federal age discrimination claims in individual arbitration. The legality of these practices will be determined through the application of generally applicable legal principles to common facts.

(e)     Class certification is appropriate under Federal Rule of Civil Procedure 23(b)(3) because common questions of law and fact predominate over questions affecting only individual class members and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation.

(f)     Class certification is also appropriate under Federal Rule of Civil Procedure 23(b)(2) because IBM has acted on grounds that apply generally to all similarly situated individuals, so that declaratory relief is appropriate with respect to the class as a whole.

16

## COUNT I

### FRAUDULENT INDUCEMENT (JURY DEMANDED)

By the acts and conduct described above, IBM has fraudulently induced Plaintiff and thousands of similarly situated victims of its discriminatory scheme to waive their right to pursue ADEA claims in court and require them instead to pursue such claims in individual confidential arbitration only.

## COUNT II

### DECLARATORY JUDGMENT ACT, 28 U.S.C. §§ 2201-02

An actual controversy of sufficient immediacy exists between the parties as to whether the confidentiality provision within IBM's arbitration agreement, which severely undermines or extinguishes Plaintiff's ability to pursue a claim under the ADEA, is enforceable.  Plaintiff seeks a declaratory judgment that the confidentiality provision in IBM's arbitration agreement is unenforceable.

WHEREFORE, Plaintiff requests that this Court enter the following relief:

1. Find and declare the whole of the arbitration provision in IBM's Separation Agreement, which IBM fraudulently induced Plaintiff and similarly situated employees to enter, to be unenforceable and otherwise void.

2. Find and declare that the provision of IBM's arbitration agreement that purports to require arbitration proceedings to enforce the ADEA to be fully confidential, and not allow the sharing of relevant documents, evidence, and rulings by employees bringing such cases, is unenforceable and otherwise void.

3. Any other relief to which Plaintiff and other similarly situated employees may be entitled.

Dated: December 16, 2021                Respectfully submitted,

                                        SHARON GILMORE, on behalf of herself and others similarly situated,

By her attorneys,

/s/ Shannon Liss-Riordan
Shannon Liss-Riordan (NY Bar No. 2971927)
Zachary Rubin (NY Bar No. 5442025)
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116
(617) 994-5800
Email:  sliss@llrlaw.com, zrubin@llrlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 16th Day of December 2021, the foregoing document

was filed electronically on the Court's ECF electronic filing system. Notice of this filing

will be sent to all parties by operation of the Court's electronic filing system. Parties may

access this filing through the Court's ECF system.

/s/ Shannon Liss-Riordan
Shannon Liss-Riordan (NY Bar No. 2971927)